## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 10-80415-CIV-HURLEY/HOPKINS

**LAURA YONKERS,**

     **Plaintiff,**

**v.**

**RIVERSOURCE LIFE INSURANCE
COMPANY,**

     **Defendant.**

_____/

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** comes before the court upon the defendant's motion for summary judgment

[DE # 23].  For the reasons given below, the court will grant the motion.

### BACKGROUND

*A.     Introduction*

On November 19, 2008, Riversource Life Insurance Company ("Riversource") issued a

$1,000,000 life insurance policy to Michael Yonkers ("Mr. Yonkers").  Mr. Yonkers wife, Laura

Yonkers ("Mrs. Yonkers"), was named as the beneficiary of the policy.  The policy contained the

following suicide exclusion:

> Suicide by the insured, whether sane of insane, within two years from the policy date
> is not covered by this policy.  In this event, the only amount payable by us to the
> beneficiary will be the premium you have paid, minus any indebtedness and partial
> surrenders.

On May 25, 2009, Mr. Yonkers died of a self-inflicted gunshot wound to the head.  Mrs.

Yonkers made a timely claim for death benefits, which Riversource denied, invoking the suicide

exclusion in the policy.  Mrs. Yonkers then filed this action for breach of contract.

### B.     Material Facts

Mr. Yonkers died in the bedroom of his home in West Palm Beach, Florida.  At the time of her husband's death, Mrs. Yonkers was in the backyard playing with her then-one-year-old son and dogs.  When she heard what she thought was a gunshot, she walked inside the house and found Mr. Yonkers in a pool of blood on the floor of their bedroom.

A Palm Beach County Forensic Investigator (the "Forensic Investigator") and Sheriff's Office Detective (the "Detective") investigated Mr. Yonkers' death.  The Forensic Investigator found the following in the Yonkers bedroom: 9-millimeter Ruger semiautomatic gun near Mr. Yonkers' hand, a single firearm casing, an empty magazine,[1] and current prescriptions in Mr. Yonkers' name for depression, insomnia, anxiety, panic attacks, and chest congestion.  She discovered blood splatter on the ceiling and what appeared to be soot on Mr. Yonkers' hand.

The Detective analyzed the bedroom and found no cleaning solution or other evidence suggesting that Mr. Yonkers accidentally shot himself.  Nor did he find evidence suggesting foul play.  He concluded that Mr. Yonkers took his life by placing a gun in his mouth and discharging it.

A Palm Beach Country Associate Medical Examiner and Forensic Pathologist performed an autopsy on Mr. Yonkers.  She observed "high velocity blood spatter on the dorsum of the left hand and patterned soot deposit on the palm," as well as gunshot residue on the roof of Mr. Yonkers' mouth.  She found that Mr. Yonkers died of an intraoral gunshot wound caused by a bullet with an "upward front to back and slightly to the left" trajectory.[2]  She concluded that Mr. Yonkers had

---

[1]  The magazine was not inside the gun, but at some other location within the bedroom.

[2]  Mrs. Yonkers argues that the doctor's conclusion that Mr. Yonkers fired the gun from within his mouth is dubious, because his teeth were intact and his face was not disfigured.  A party opposing a properly supported motion for summary judgment must set forth specific facts showing that there is genuine issue for trial. Fed. R. Civ. P. 56(e); *see Barfield v. Brierton*, 883 F.2d 923, 934

committed suicide.[3]

The gun with which Mr. Yonkers' shot himself was not his but his wife's.  Nonetheless, Mr. Yonkers was experienced with guns and held a concealed weapons permit.  He practiced shooting guns at ranges.

Mr. Yonkers had many positive aspects to his life at the time of his death.  For one thing, he owned a successful business, which designed computer systems and intranets for well-known companies, such as General Electric and Suntech Transport.  His business was profitable, and the Yonkers had no financial problems.  In the months leading up to his death, Mr. Yonkers was actively involved in the business and was purchasing new software and upgrading his office equipment.

In addition, Mr. Yonkers appeared to have an active social life.  Two days before Mr. Yonkers' death, the Yonkers hosted a party at their home, where Mr. Yonkers socialized with friends.  He also had hobbies, including a project to build a racecar.  He maintained a close relationship with his family, some of whom lived close to the Yonkers and helped care for their son.  Mrs. Yonkers affidavit states that she had a "stable and happy marriage" and that Mr. Yonkers "never gave any hint or indication . . . that he was suicidal."  The Yonkers were planning on having a second child.

All was not well with Mr. Yonkers, however.  He was suffering from tinnitus (a constant ringing in his ears), which he began experiencing after shooting a gun at the range.  The ringing prevented Mr. Yonkers from sleeping properly and caused him severe stress.  He tried numerous

_____

(11th Cir. 1989).  Mr. Yonkers has not done so here.  Accordingly, the court rejects her argument as speculation and credits the doctor's expert opinion.

[3] Her report also indicates that Mr. Yonkers had the active ingredient for marijuana in his body at the time of death.

remedies without success.  On one occasion, he talked about sticking a screwdriver in his ear to stop the ringing.  Mr. Yonkers also suffered from the feeling that insects such as spiders were always crawling on him.  He lamented that he felt he was "going nuts."

Mr. Yonkers was seeing a psychiatrist for these problems, and was taking Lexapro and Xanax (antidepressants), Restoril (insomnia), and Alprazolam (anxiety and panic attacks), among other medications.  Although the Yonkers tried for several months to have a second child, they were unsuccessful, largely due to the medication.  Mr. Yonkers became increasingly frustrated and depressed.  He was using marijuana socially.

The medication had negative side effects on Mr. Yonkers, most notably fits of rage.  In her deposition, Mrs. Yonkers testified that, on one occasion, Mr. Yonkers "picked a grapefruit out of the fruit bowl and chucked it through the wall" in their home.  On another occasion, he kicked a garbage can.  Two nights before his death, he tore off a plastic towel rack in the bathroom.

According to the notes of his psychiatrist, Mr. Yonkers' depression was improving in the months before his death.  However, in his deposition, the psychiatrist testified that he did not know that Mr. Yonkers was using marijuana, was having rage problems, and was feeling a sensation that insects were crawling over him.  He testified that, had he known these thing, he would have "immediately [placed Mr. Yonkers] in the hospital" and "would have had him on antipsychotics."

## JURISDICTION

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.

Venue is proper in this court pursuant to 28 U.S.C. § 1441(a), because the case was removed from the Circuit Court for the Fifteenth Judicial Circuit in and for Palm Beach County, Florida,

which is located within the Southern District of Florida.

## DISCUSSION

### A.      *Standard on Motion for Summary Judgment*

Summary judgment is warranted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of meeting this exacting standard. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In determining whether summary judgment is appropriate, the facts and inferences from the record are viewed in the light most favorable to the non-moving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Matsuhita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

The non-moving party, however, bears the burden of coming forward with evidence of each essential element of his claims, such that a reasonable jury could return a verdict in his favor. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002). In response to a properly supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on the basis of which a jury could reasonably find for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A complete failure of proof

concerning an essential element of the non-movant's case necessarily renders all other facts immaterial and entitles the moving party to summary judgment.  *See Celotex*, 477 U.S. at 323; *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998).

**B.      *Riversource's Motion for Summary Judgment***

Riversource moves for summary judgment on Mrs. Yonkers' claim for breach of contract, contending that Mr. Yonkers' death was not covered by the policy because he committed suicide within two years of its effective date.  Mrs. Yonkers argues that Riversource's motion should be denied for several reasons.  First, she claims that the suicide exclusion is unenforceable due to an ambiguity in the insurance policy.  Second, she contends that Mr. Yonkers' mental capacity was so diminished that he was unable to form the intent to intentionally kill himself.  Third, she argues that there are genuine issues of material fact on the issue of whether Mr. Yonkers intentionally killed himself.

*1.      Whether the Insurance Policy is Ambiguous*

Mrs. Yonkers argues that an ambiguity in the insurance policy renders the suicide exclusion unenforceable.  She admits that the "suicide exclusion itself is unambiguous," but argues that, since the insuring provision "is not qualified by reference to or inclusion of any exclusion," the suicide exclusion is unenforceable.

It is well-established that exclusionary clauses are construed more strictly than coverage clauses, and if exclusions are ambiguous or susceptible of more than one meaning, they must be construed in favor of coverage.  *See Fayad v. Clarendon Nat'l Ins. Co.*, 899 So.2d 1082, 1086 (Fla. 2005); *Psychiatric Assoc. v. St. Paul & Fire Marine Ins. Co.*, 647 So.2d 134 (Fla. 1st DCA 1994); *Bankers Life & Cas. Co. v. Vadra*, 563 So.2d 200, 201 (Fla. 3d DCA 1990).  However, Florida law

cautions that courts must not construe the terms of an insurance policy to create an ambiguity where none exists. *City of Delray Beach, Fla. v. Agric. Ins. Co.*, 85 F.3d 1527, 1531 (11th Cir. 1996).

In this case, there is nothing ambiguous about the fact that insuring provision of the life insurance policy does not reference the exclusion. As explained by the Eleventh Circuit:

> [S]imply because one provision gives a general grant of coverage and another provision limits this coverage does not mean there is an ambiguity or inconsistency between the two. This is the very nature of an insurance contract; exclusions in coverage are expressly intended to modify coverage clauses and to limit their scope . . .. Both the coverage clause and the exclusion clause are given equal dignity within the contract.

*Ajax Building Corp. v. Hartford Fire Ins. Co.*, 358 F.3d 795, 799 (11th Cir. 2005) (applying Florida Law).

Mrs. Yonkers cites several cases for the proposition that "[a]n insurance policy cannot grant rights in one paragraph and then retract the very same right in another paragraph called an 'exclusion.'" *See, e.g., Tire Kingdom, Inc. v. First Southern Ins. Co.*, 573 So.2d 885, 887 (Fla. 3d DCA 1990). This proposition does mean what Mrs. Yonkers suggests, however. It means that a policy cannot provide specific coverage for an activity in one section and then exclude that very activity in another section. For example, in *Purrelli v. Sate Farm Fire & Cas. Co.*, an insurance policy that provided coverage for specified intentional torts, including invasion of privacy, and then excluded coverage for intentional acts was ambiguous, because the insuring provision and the limitation completely contradicted each other. 698 So.2d 618, 620 (Fla. 2d DCA 1997). Here, the insurance policy does not specifically cover suicide and then exclude suicide. Accordingly, the exclusionary clause is not ambiguous, and the rule concerning ambiguities does not apply.

7

2.      *Whether Mr. Yonkers was Competent*

Mrs. Yonkers contends that Mr. Yonkers' depression and medication so diminished his mental capacity that he did not have the intent to commit suicide.  This argument is without merit. The insurance policy in this case provides that suicide is not covered no matter whether the insured was "sane of insane."

In *Charney v. Illinois Mut. Life Cas. Co.*, the Eleventh Circuit, construing an insurance policy which also contained "sane or insane" language, rejected the argument that a decedent who started showing signs of severe depression after taking medication for hypertension was not capable of forming the intent to commit suicide, explaining that "the only intent [required under Florida law] is the intent to cause death."  764 F.2d 1441, 1443 (11th Cir. 1985).  The court held that "[w]hatever the effect of the [prescription] on the insured, the direct cause of his death was the self-injection of [poisonous] solution."  *Id.*  Likewise, here, irrespective of the effects his medications had on him, if Mr. Yonkers intentionally shot himself, his death is excluded from coverage under the insurance policy.

3.      *Whether Mr. Yonkers Committed Suicide*

The parties dispute whether Mr. Yonkers committed suicide or whether his death was accidental.  To prove that Mr. Yonkers intended to commit suicide, Riversource must show that he possessed "the intent to achieve self-destruction."  *Charney*, 764 F.2d at 1443.  Absent intent of self-destruction, "there would be no suicide because the death would be accidental."  *Id.*  An accidental death would be covered by the Riversource insurance policy.

A general presumption against suicide applies under Florida law.  *See Mutual Life Ins. Co. of New York v. Johnson*, 166 So. 442, 445 (Fla. 1936).  The presumption against suicide is overcome when the insurer introduces "credible evidence of suicide."  *C.M. Life Ins. Co. v. Ortega*, 562 So.2d

8

702, 703 (Fla. 3d DCA 1990). There appears to be a conflict in Florida courts about whether proof of suicide must be established by a preponderance of the evidence, *see Ortega*, 562 So.2d at 703, or by clear and convincing evidence, *see Weinstock v. Prudential Ins. Co. of Am.*, 247 So.2d 503, 504 (Fla. 1st DCA 1971). For the reasons given below, the court need not resolve this conflict.

After carefully considering the arguments of counsel and the record evidence, the court concludes there are no genuine issues of material fact that Mr. Yonkers killed himself in an attempt to achieve self-destruction. The uncontroverted record evidence shows that Mr. Yonkers, who was experienced with guns, placed a loaded gun in his mouth, pointed it in an upward direction, fired it, and killed himself. There are simply no facts to suggest that Mr. Yonkers died in any other manner.[4]

The manner of Mr. Yonkers' death must be viewed in light of all the problems he was having. He was suffering from tinnitus and a nagging feeling that insects were crawling on his skin. He was dejected over his inability to have another child. He was depressed and was taking numerous medications. And he smoked marijuana and had violent outbursts, one as recent as two days before his death. To be sure, Mr. Yonkers had many positive aspects to his life. He had friends, family, hobbies, and a successful business. But his problems were serious and significant – so much so that his psychiatrist asserted that, had he known about the true extent of them, he would have ordered Mr. Yonkers hospitalized and placed on antipsychotics.

---

[4] Mrs. Yonkers' expert on suicidology posits that Mr. Yonkers might have shot himself while making a suicidal gesture in which he did not intend to actually kill himself. Where, as here, insurance company relies upon circumstantial evidence to prove that the death was by suicide, the evidence "must be such as is inconsistent with every reasonable hypothesis of accidental death." *Weinstock*, 247 So.2.d at 505-06. In this case, the record is inconsistent with the theory that Mr. Yonkers accidentally killed himself in a suicidal gesture. The record shows that Mr. Yonkers intended to achieve self-destruction. There are simply no facts to support the suicidal-gesture hypothesis.

Order Granting Defendant's Motion for Summary Judgment
Yonkers v. Riversource Life Ins. Co.
Case No. 10-80415-CIV-HURLEY/HOPKINS

Based on the record, the court concludes that no reasonable jury could conclude that Mr. Yonkers did not committed suicide.  The court finds that the proof of suicide in this case satisfies the "clear and convincing" standard; thus, the court need not resolve the conflict among Florida courts as to the burden of proof.

Because suicide is excluded from coverage under the Riversource life insurance policy, Mrs. Yonkers' claim for breach of contract must fail.  Therefore, the court will enter summary judgment in favor of Riversource.

## CONCLUSION

The court concludes that the exclusionary clause in this case is not ambiguous, that Mr. Yonkers had the capacity to commit suicide, and that the record evidence shows by clear and convincing evidence that Mr. Yonkers committed suicide.  Accordingly, it is **ORDERED** and **ADJUDGED** that:

1.     The defendant's motion for Summary Judgment [DE # 23] is **GRANTED**.

2.     Pursuant to Fed. R. Civ. P. 58(a), the court will enter final judgment by separate order.

**DONE** and **ORDERED** in Chambers in West Palm Beach, Florida, this 31st day of January, 2011.

Daniel T. K. Hurley
U.S. District Judge

For updated court information, visit unofficial Web site
at http://www.judgehurley.com